ALBERT P. RUERAT *vs.* LOUIS W. CAPPELLI *et al.*

DECEMBER 14, 1936.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker, and Condon, JJ.

FLYNN, C. J.   This is a petition for a writ of mandamus directed to the respondents and commanding them to open certain voting machines used in the city of Warwick in the election on November 3, 1936, and to make a permanent record of the votes for mayor shown on said machines.

The petitioner, Albert P. Ruerat, is a candiate for mayor of that city and the respondents are Louis W. Cappelli, who is secretary of state, and others who are members of the city special vote-tabulation committee, by virtue of appointments made under the authority of public laws 1935, chapter

2195. The case is the first litigated action requiring construction of chapter 2195, the voting-machine law, so-called, and involves questions which arise out of the first election to be held in this city or state, wherein voting was accomplished through the use of voting machines, as authorized by said statute.

The matter was heard on two phases; first, whether under the existing circumstances we should exercise our discretion at this time in permitting the filing of the petition; and, second, if we permitted it to be filed, what disposition should be made of the case upon its merits.

Evidence was heard from all of the available election officials of ward seven in the city of Warwick and from some others, primarily to learn what evidence was offered to the special city vote-tabulation committee, and which it refused to hear, so that we might be guided in deciding, from known circumstances, whether a petition for mandamus at this time ought to be entertained by us. This evidence was also heard upon the second phase in order to ascertain if there were any competent legal evidence upon which the committee could justify its refusal to hear the evidence on the petitioner's protest and to refuse his prayer. We were not originally concerned with the weight of the evidence or the credibility of the witnesses, in keeping with recognized precedents relating to mandamus and other prerogative writs, seeking the review of discretionary acts.

At the outset, it became apparent that we should know something of the mechanical operation of the voting machines, especially in view of certain general allegations of irregularities in the election and of certain doubts expressed by petitioner's counsel concerning the security of the voting machines themselves against possible alterations.

Under these circumstances we granted, out of what seemed to us abundant caution, the petitioner's request to have the machines in question sealed to preserve the *status quo*. Later, a physical demonstration of a voting machine, similar in all vital respects to those in question, was held at our

request for the benefit of this court, with interested parties, counsel, and representatives of the press present. This demonstration was conducted by the secretary of state, personally, who is charged by law with the custody of the voting machines and with the duty of instructing election officials in their respective duties, relating to the use and operation of the machines. He was assisted by Professor Paul N. Kistler of Brown University, who previously had been engaged by the state to make a special study of the specifications and manufacture and operation of the machines before they were finally accepted by the state. All of the essential operations and requirements of the law, from the time a machine is turned over to the moderator at the opening of the polls, until returns are checked and it is sealed after the close of the polls, were then demonstrated. From this we think that it became at once apparent to all interested persons that these voting machines in question are unusually efficient and reliable; that the secretary of state alone has the master key which is absolutely necessary to permit access to the counters and registers and real governing parts within the machines; that the numerous safety devices, operating independently of each other, serve to check any attempt to tamper with or change the counters or registers of the machine, and to reveal such tampering, if actually attempted. From statements of both the secretary of state and Professor Kistler, it appears beyond any question that, under any conceivable circumstances that reasonably might prevail in an ordinary election, these machines can not be changed or tampered with, except with damage to the machine or by use of the master key and the manipulation of the machine, which would necessarily leave evidence of such change or tampering.

As a further safeguard, the machines in question were placed, immediately on their return from the election districts in Warwick, in a separate room in the Providence County Court House under a special guard of sheriffs and a

representative of the secretary of state. After this demonstration no further doubt or allegations of irregularities involving these machines was suggested or made by any of the parties, counsel or witnesses. In fact, it now appears unquestionably that the irregularities complained of do not relate at all to the operation or correctness or reliability of the voting machines themselves, but rather to the alleged failure of election officials in certain wards in the city of Warwick to perform their duties, in accordance with the law, after the polls were closed.

On the first question presented, counsel for the respondents argues that the petition should not be filed in the supreme court in the first instance. He asserts that such filing in this court would be a substantial departure from established practice and that nothing appears that would suggest the necessity of deciding the case immediately. He further argues that the superior court has concurrent jurisdiction with this court to grant writs of mandamus under general laws 1923, chap. 323, sec. 9. We are inclined to agree generally with this last contention. In the ordinary case we think that a petition for a writ of mandamus should be addressed in the first instance to the superior court. The above statute, of course, does not oust this court of jurisdiction nor does the proposed practice limit our right, in a proper case, to entertain such a petition. In the absence of unusual elements, it seems to be the better practice to have the matter heard in the superior court where a record can be made, preserving to any party aggrieved by the decision of that court a right to prosecute suitable appellate proceedings in this court.

The instant case, however, presents some unusual features which we have considered, especially in view of the importance of the subject matter, the general public interest involved and the fact that this is the first litigated case to raise before us questions of the construction and procedure under the voting-machine law. It appears that application was made by the petitioner to the superior court, in the

first instance, in the form of a petition *in equity*, and that court refused to take jurisdiction under the authority of *Boss* v. *Sprague*, 53 R. I. 1. Of course, had the petition been for mandamus and not in equity, that case would not have prevented the superior court from taking it. The petition was then changed, however, to one for a writ of mandamus and was presented to this court in order to obtain an injunction and order securing the voting machines as they were until the matters could be adjudicated.

To send the case back now to be heard *de novo* by the superior court on evidence, which already we have heard, would delay too unreasonably its final decision. Considerable time must elapse before it could be brought before us again on appeal, which seems to be the manner intended by the act, for reviewing disputed decisions. Meanwhile, some relevant time elements have entered and may be considered by us as giving the case certain unusual features. Immediate decision is also desirable to prevent unnecessary delay in the completion by the state special committee of its own final tabulations from ward seven return, or, as the case may be, from the corresponding machines which are now sealed in accordance with the order issued in this case.

The advantage which could result from following the procedure indicated above for ordinary cases seems to be outweighed, under all the existing circumstances in this case, by the disadvantage which might now follow if its decision were delayed. Therefore, we have chosen to treat the matter as containing unusual elements of time, and as otherwise sufficient to warrant the exercise of our discretion in permitting the petition to be filed, and we shall decide it upon its merits.

In connection with the second question, the disposition to be made of the petition on its merits, the respondents contend that the petition should be confined to the specific remedy sought and that the separate prayer "for other relief" is a departure from established practice on petitions

for mandamus. In so far as the petition relates to the common law writ of mandamus, we agree with the respondents' contention. In the consideration of the instant case, therefore, we shall eliminate prayer (E) of the petition "for other relief" as surplusage and confine our determination to the specific remedy sought. Moreover, the petition includes allegations and prayers concerning the election returns and the voting machines used in wards four and seven in the city of Warwick. No evidence was presented by the petitioner and nothing whatever appears in the record or evidence to support any allegations of the petition relating to voting machines used in ward *four*, or to the return therefrom. Therefore, we must deny his prayer for relief in so far as it relates to any machines used in ward four.

Consequently we shall confine our decision in the instant case to the petitioner's allegations and prayer relating to the returns and machines used in ward seven in the city of Warwick. Further, we are concerned only with the special vote tabulation committee of the city of Warwick. Unless otherwise qualified, future references to the committee will mean the special vote-tabulation committee of the city of Warwick.

The instant case involves the construction to be placed upon certain provisions contained in chapter 2195, public laws 1935. This chapter, in our view, contemplates the existence of two separate kinds of special vote tabulation committees, one to function within the field of the state and general elections; and the other, to function within the field of city and town elections.

The first, or state special committee, was already substantially in existence when chapter 2195 was passed, and approved April 22, 1935; its creation, powers and duties are expressly set forth in general laws 1923, chapter 18, as amended by public laws 1935, chapter 2250. The existence and functioning of this state committee are recognized and continued under chapter 2195, which makes only such adjustments as were considered necessary to accommodate its work to the new method of voting by machines.

The second class, the city or town special committees, unlike the first, was not previously in existence by virtue of any other statute but was created by chapter 2195. However, the language of chapter 2195 does not prescribe precisely or completely all of its powers and duties. The provisions concerning this city or town special committee seem to be mingled in the statute, in some respects, with provisions which largely and expressly relate to the state special committee. This causes considerable confusion, but there are references enough in the statute to the creation of this committee, and to certain of its powers and duties, to warrant the conclusion that the general assembly intended to give to it, within its own proper field, powers and duties similar to those more expressly given to the state special committee.

In reaching this conclusion, as also in making certain other deductions in this opinion, we have considered not only the language used, in its ordinary meaning, but also its context and the evident purposes of the statute as a whole.

The primary duty of each of these special committees is expressly stated in chapter 2195 to be that of "receiving, reviewing and tabulating for final totals the returns and tabulations from the respective voting-machines used in the respective elections." (sec. 19) We are bound to assume that these special committees must perform the duties imposed upon them by the law. Likewise, we must assume that the performance of these duties presupposes that the several election returns, from which these committees make their own tabulations for final totals, have been prepared, tabulated, checked and certified previously in substantial compliance with the pertinent provisions of the law. (chapter 2195)

Evidently the general assembly had this clearly in mind when writing the particular provisions concerning the district election returns and the duties of election officials relating thereto. In section 18, immediately preceding the

statement of the committees' duties, as above quoted, the general assembly explicitly prescribed the duties of election officials immediately upon the close of the polls. It expressly and carefully sets out the various steps which it deemed necessary to be performed by election officials in each district in order to compile, for the later consideration of the special committees, proper and official election returns. Thus, section 18 requires, among other things, that: "Immediately upon the close of the polls the moderator shall lock and seal the machine against voting and shall open the counter compartment, and in the presence of the other election officers and watchers, the moderator shall proceed to read off in a clear and loud voice the vote for each candidate, and upon each question as indicated by the counters, and the votes cast for persons not nominated."

The same paragraphs continues: "While the moderator is so announcing the vote, the clerk shall record the same on the forms provided for in section eleven of this act."

Then it proceeds to give instructions to the clerk to record the votes cast for each candidate and upon each question in the state election, "and upon the blanks furnished by the secretary of state he shall record in ink the votes cast for each candidate and person and for and against each question in the town election, and the number registered on the protective counter, if any; *and such records shall be known, respectively, as state election returns and town election returns.*" Immediately follows a most important requirement. "*The moderator and one supervisor of each political party shall each separately compare such returns with the counters of the machine, and if they are found to agree, such moderator, clerk and supervisor shall sign such returns.*" The paragraph continues: "The clerk shall thereupon copy such returns in ink in the record book of the elective meeting now provided for by law, and the moderator shall compare the copy made in said book with the counters of the machine, and if they are found to agree, he, together with the clerk, shall sign such record

book." Then follow certain instructions and provisions. concerning the number of return-sheets prepared for each machine used in the district and the definite details necessary to be shown in the record book, and the further requirements for the complete locking and sealing by the moderator of the voting machines, "so that the devices. cannot be worked nor the counters or registers changed," as well as for the proper disposition of the keys, and custody of the sealed records, returns and machines, until eventually the returns and records become available to the state and city special committees, as the case may be, for their respective considerations and the performance of their duties.

Thus it will be seen that adequate provisions are carefully and expressly made for the preparation of the returns and records originally from the numbers appearing on the counters and registers of the voting machines; that the returns, as written by the clerk, are then properly checked with the original numbers on the machines; that the records copied by the clerk into the record book from the returns are checked with the machine counters and registers. These duties, and their performance by election officials, are stated in mandatory terms and are not left to any arbitrary discretion, at least in so far as substantial compliance therewith is concerned, and penalties are later provided in the statute for various violations thereof.

When district voting returns are prepared, checked, counter-checked and signed by designated election officials, in substantial compliance with the plain and unambiguous provisions of the law, the special committees may reasonably rely on them as the bases for their own tabulations for final totals. Otherwise what reason would there be for setting up such specific and exacting requirements for their preparation and certification? Moreover, it seems obvious to us that the general assembly intended to impress upon such returns, that is, returns made up in substantial compliance with the law, a definite and official character.

Section 18, immediately after stating the above requirements, provides that "and said returns shall be of the same force and effect in determining the vote cast for any candidate and person, or for and against any question, as would ballots cast for such candidates, persons, or for and against such questions under the provisions of any other provision of law in regard to elections."

Therefore, such returns apparently are deemed by the general assembly to be official and to represent correctly the will of the voters as expressed and recorded in the corresponding voting machines. In other words, these returns are treated as and for ballots representing the collective intent and will of the voters as expressed and recorded in the respective voting machines.

This seems clear and reasonable to us because, with such compliance with the law, the special committees would very rarely be required to have recourse to the numbers on the counters of the machines themselves, in order to arrive at reliable tabulations for final totals and for the declaration of results.

The statute further gives to these special committees certain discretionary powers, which include the right to have the machines opened and examined whenever it deems such action necessary for the proper discharge of its duty in counting, tabulating and declaring the votes cast for any candidate in the election. (sec. 19)

In the case of the state special committee, the discretion is more fully referred to in sections 9 and 10 of chapter 18, G. L. 1923, as amended by chapter 2250, P. L. 1935. From these sections it is apparent that the general assembly intended to provide, in a proper case, a means of correcting errors and of ascertaining the true count of votes actually cast for various candidates and upon questions in elections. Section 9 relates to the power of the committee, in the case of lost or destroyed ballots, to make certain investigations for use in its count and tabulations. Section 10 provides as follows: "In case the return made to the said board by

the supervisors of election, or any of them of any town, ward, or district meeting shall contain any statement which makes it desirable or proper, in the opinion of said board, to investigate the conduct of the election thereat, said board may investigate the truth of the allegations contained in such supervisors' returns, and of all the circumstances connected with the holding of such election, and shall use in their count and tabulation, as the result of the voting at such meeting, such number of votes for the respective candidates and for and against the propositions or questions voted for or on thereat as such investigation, in their opinion, proves to be correct."

The language of these sections relates to the state vote-tabulating board which, in our view, was the predecessor of the special state committee. It is clearly potential and unquestionably indicates a legislative intent to vest some discretion in the special board or committee. By analogy and reasoning, we think that they are applicable, in substantial respects, to similar situations produced by the introduction of voting machines, and that they were intended, by chapter 2195, to be applicable as far as possible to both the state and the city special committees, acting within their respective spheres. What, if any, limitation is imposed by law upon this or other discretion of the special city committee, in the light of the particular facts here and in the presence of a timely written protest by a proper person, is a vital question pertinent to the decision of this case.

The record book of the city clerk, containing the proceedings before the committee on November 4, 1936, is in evidence before us and is not disputed nor attacked. From it the following important facts appear. The committee was hurriedly organized just before the meeting in question. Some question arose because of purported over-lapping duties of the board of canvassers, which formerly canvassed the returns and ballots. The committee as such acted without legal advice of the city solicitor or of any

counsel peculiarly its own. Timely protests were made orally and in writing by proper persons, and were accompanied by offers of proof to establish, by competent evidence, the petitioner's allegations of irregularities and illegalities relating to the election returns from ward seven.

The election return from ward seven was not signed and certified by the Republican clerk or supervisor, or indeed by any election official accredited by the Republican party. The committee voted not to hear evidence, as offered, and not to investigate the votes appearing on the counters of the voting machines. It also voted to use, in making its proposed tabulations for ward seven and for the city election, the return which had been received from ward seven and which was objected to as being illegal. It also voted, based upon its computations including the figures upon the disputed return from ward seven, that "Mayor O'Brien be declared elected mayor of the city of Warwick by a plurality of 243 votes, subject to the counting of the absentee ballots."

The city clerk was then instructed by the board (meaning the committee) to notify counsel for all adversary candidates and the members of the board, as soon as the clerk received the absentee ballots. From these latter references in the clerk's record, it is clear that the board and all parties appear to have misconceived the law with respect to absentee ballots. These could not affect a municipal election, since no provision is made by the constitution and the law for use of absentee ballots therein. However, it does show that the disposition was not final in the minds of the committee, which contemplated a further meeting before a final tabulation and declaration of results.

Obviously, the committee could reconsider and possibly change its attitude after further investigation of the law and after finding that there were no absentee ballots to be considered by them. On the basis of an inspection of voting machines, if decided upon, the committee could alter or confirm the previously purported final tabulation.

Since no appeal has been filed as yet by either candidate, the attitude of all interested parties, including the committee, seems to indicate to us that the matter was not finally disposed of. Therefore, objections that the present procedure should be by appeal and not mandamus, which might otherwise lie, may be disposed of on this ground.

The undisputed evidence confirms the record of the city clerk that the return from ward seven was not prepared in substantial compliance with the law and, on its face, showed a want of signatures by the officials designated to perform that duty. It may well be, as contended by the respondents, that failure to have a proper return made out in the first instance was chargeable to the unwarranted conduct of the clerk, who refused to perform his duties and who conducted himself according to his own interpretation of the law. Moreover, it is understandable that the Republican supervisor's failure to check the votes, as they were being announced from the machines by the moderator, was chargeable perhaps to his own misunderstanding of the instructions of the moderator. And it may be that the instructions given by the moderator were perhaps misleading or open to being misunderstood by others since he was serving for the first time as an election official and admittedly based his instructions on his own interpretation of the law.

It may be quite possible too that, upon a proper investigation of the machines, no material errors or mistakes would appear; or if any, that they were due to misconception of the law or misunderstandings and not to any intent to violate its provisions. However, notwithstanding these reasonable possibilities, the net result before this committee, in the presence of a timely and adequate protest, is not altered. The return from ward seven was not properly signed and certified. It showed on its face that it was not the official return which the committee otherwise could presume was prepared in substantial compliance with the provisions of chapter 2195. The evidence, if heard, would have confirmed the fact that the defect was not accidental

or possible of any amendment without reference to the machines. The undisputed evidence also would have confirmed the allegation that the Republican supervisor, for one reason or another, was not able to and did not check the return with any of the machines in substantial compliance with the law. The acting clerk did not write on the return the votes as they were announced by the moderator from the first machine. The Republican supervisor tried to check the first two machines but was unable to see the figures on the counters from the position to which, in his understanding, he was limited by the moderator. The last two machines were not attempted to be checked by him under the conditions and were not checked with the return. All the machines were locked promptly and no further opportunity to check them with the return was possible.

For three reasons the Republican supervisor refused to sign the second certificate on the return. Therefore, the committee had before it no return from ward seven which it could even presume to consider as if it were prepared in substantial compliance with the law.

Where it is impossible for the committee to perform its primary legal duty solely from the various election returns as made, and where the means by which it may discharge that duty properly, namely, the machines, are preserved intact and available, and where there is a timely and adequate protest, then such discretion, as is vested in the committee, is necessarily limited by the requirement that the committee must perform the primary duty imposed upon it by the law. In such circumstances, the duty of the committee, at least to that limited extent, seems largely to be in the nature of a ministerial duty. If, on the other hand, it may be considered as discretionary in such circumstances, we feel that the discretion is reasonably to be exercised only in one way, namely, in such a way as will permit it to perform its primary legal duty.

It is impossible for the committee, without opening and making a record of the number of votes appearing on the counters of the voting machines of ward seven, to perform its primary legal duty. It had no proper official election return from ward seven which it could use in its final tabulations.

It is agreed apparently by counsel that mandamus is proper to compel the performance of a ministerial duty but not to compel the performance of a discretionary one, unless that discretion is legally exercisable only in one way. There is no discretion in the committee in these circumstances which permits it to perform or not to perform its legal duty as it sees fit. Its primary duty is prescribed in mandatory terms. It has, to some extent, certain discretion as to the manner and method of its performance, but it must perform its legal duty.

In the instant case the committee can not perform its legal duty unless it opens and makes a record or return from the machines used in ward seven. It has no official election return from that ward which it could use, under the circumstances, to legally make up its final tabulations. In legal effect, it is as if there were no return at all from ward seven before the committee. If it were dealing with ballots under the law and there were a defective return or no return at all, the ballots themselves would be counted. Here the expressed intent and will of the voter is recorded and available. Under the circumstances, to compel the committee to do that, which by law it must do and in this case can do only in one way, is not to usurp any of its powers, discretion or function. Nor does it violate accepted rulings relating to mandamus as we interpret them.

While we think that, as far as possible, questions arising under chapter 2195 should be brought up by appeal as indicated therein, or in proper cases by resort to the superior court in the first instance, nevertheless, we are of the opinion that we should entertain the instant case and decide it upon its merits.

For reasons herein set forth, we are of the opinion that the prayer of the petition for relief, directed to the respondents and commanding them to open voting machines numbered 0639, 0590, 0973 and 0682 used in ward seven and to make a permanent record of votes for mayor of the city of Warwick as shown on said machines, should be granted.

It is further ordered that a writ of mandamus issue accordingly, returnable forthwith, and that said Louis W. Cappelli, as secretary of state, be authorized to break the seals placed in accordance with the order of this court made on the sixth day of November, 1936, and open said voting machines at any time in accordance with the powers conferred on him by statute.

*Harold A. Andrews, Edward L. Godfrey,* for petitioner.

*Thomas F. Cooney, Carroll & Dwyer, John P. Hartigan, Attorney General,* for respondents.